IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID FLUELLEN, | ) | CASE NO. 1:19CV378 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff David Fluellen ("Fluellen") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying his applications for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the

undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule

72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

## I. Procedural History

On September 23, 2016, Fluellen filed applications for DIB and SSI, alleging a disability

onset date of September 23, 2013.[1]  Tr. 193.  He alleged disability based on the following:

bipolar disorder, PTSD, major depression, and acute anxiety.  Tr.  431.  After denials by the state

agency initially (Tr. 136, 137) and on reconsideration (Tr. 188, 189), Fluellen requested an

---

[1] Fluellen's earlier application was denied on September 25, 2013.  Tr. 116.

administrative hearing. Tr. 232. A hearing was held before an Administrative Law Judge ("ALJ") on November 2, 2017, and the ALJ thereafter issued an unfavorable decision. Tr. 190, 193. Fluellen requested that the Appeals Council review the ALJ's decision (Tr. 289) and the Appeals Council granted his request for review, vacated the decision, and remanded to the ALJ (Tr. 214-215). The ALJ held a new hearing on October 2, 2018. Tr. 77. In his November 8, 2018, decision (Tr. 14-32), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Fluellen can perform, i.e., he is not disabled. Tr. 29-30. Fluellen requested review of the ALJ's decision by the Appeals Council (Tr. 364) and, on January 23, 2019, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Fluellen was born in 1979 and was 34 years old on his alleged disability onset date. Tr. 31. He did not finish high school and has not gotten a GED. Tr. 1150. He has a medical assistant certificate. Tr. 1150.

### B. Relevant Medical Evidence

In July 2013, Fluellen was psychiatrically hospitalized due to suicidal ideation with a plan to slit his throat with a knife. Tr. 549, 669. He had been noncompliant with prescribed psychotropic medications and recently relapsed after 3.5 years of sobriety. Tr. 549. He expressed violent thoughts toward his brother but he was able to control his anger and not hurt his brother. Tr. 549.

In September 2013, Fluellen went to the emergency room for suicidal ideation and reported feeling down the last week and a half. Tr. 661.

In November 2013, Fluellen was hospitalized for two nights for suicidal ideation.  Tr. 649.  Upon exam, he was alert, oriented, cooperative, had an appropriate mood and affect, but had suicidal thoughts.  Tr. 650.

In December 2013 and January 2014, Fluellen went to the emergency room for psychotropic medication refills.  Tr. 645-648.  He denied symptoms and was noted to have a good understanding of the need for his medication.  Tr. 645-648.  He was prescribed short-term courses of his medications and advised to follow up with his providers.  Tr. 645-648.

In May 2014, Fluellen went to the emergency room for suicidal ideation with a plan to cut his wrists and was transferred to inpatient care, where he remained for eleven days.  Tr. 602, 619.  He was noted to be depressed and have a blunted affect.  Tr. 619.  He had recently used alcohol, cocaine and marijuana.  Tr. 611.  He admitted to having a substance abuse problem and stated, "I relapsed on alcohol, was feeling suicidal.  I want to get to a program."  Tr. 620.  Upon exam, he was alert, had a clean appearance, normal speech, logical thought processes and content, clear insight, average judgment, good impulse control, intact memory, and calm and cooperative behavior.  Tr. 622-623.  He scored 30/30 (normal) on a Mini Mental Status Examination.  Tr. 622.  He was diagnosed with mood disorder, polysubstance dependence, and personality disorder.  Tr. 624.  His symptoms improved with medication and he was referred to individual therapy and a substance abuse treatment program.  Tr. 625.

In July 2014, Fluellen went to the emergency room because he was thinking about suicide again.  Tr. 580.  Despite waiting 24 hours to be seen by the staff, he was pleasant during his interview.  Tr. 581.  He reported that his living situation was stressful and he had been drinking alcohol excessively to cope.  Tr. 581.  He had had time to think through his crisis and was no longer suicidal when he was interviewed.  Tr. 581.  He was medication compliant and his

medications were helpful and effective and he did not need a medication change.  Tr. 581.  He agreed to spend the night at the facility.  Tr. 582.

In August 2014, Fluellen went to the emergency room for psychotropic medication refills.  Tr. 643.  He reported no acute problems, no suicidal or homicidal ideation, and denied depression.  Tr. 643.  His prescriptions were refilled.  Tr. 644.

In April 2015, Fluellen went to the emergency room for a medication refill after driving to his clinic to see his doctor and learning that the doctor was out of town.  Tr. 640.  He had reported finishing his medications the night prior and was worried that his symptoms would come back if he was not on his medications.  Tr. 640.  He had no complaints.  Tr. 640.  Upon exam, he was cooperative and not anxious or depressed.  Tr. 641.  He was prescribed a short course of psychotropic medications until he could follow up with his primary care physician.  Tr. 641-642.

In May 2015, November 2015 and April 2016, Fluellen went to the emergency room for prescription refills.  Tr. 629-639.  He denied substance abuse and remained compliant with prescribed medications.  Tr. 631, 633, 636.  He reported feeling well and his mental status examinations were normal, including cooperative behavior, appropriate affect and mood, full orientation, normal speech and normal judgment.  Tr. 629, 631, 633, 635, 638.  He was continued on his medication regimen.  Tr. 629-639.

In May 2016, Fluellen went to the emergency room for a refill of his Zoloft, which he had been out of for one week.  Tr. 694-695.  He was experiencing no symptoms and was planning on following up with his provider in a week when his insurance began.  Tr. 695.  His Zoloft was refilled.  Tr. 696.

On July 4, 2016, Fluellen went to the emergency room for a refill of his medications.  Tr.

4

680.  He had run out of his sertraline earlier that day and his doxepin two days prior.  Tr. 680.
He was compliant with his Zoloft and lithium.  Tr. 680.  He denied suicidal ideations, did not
appear manic, and was described as "pleasant."  Tr. 682.  He was provided with a short-term
course of his previously prescribed medications.  Tr. 682.

On July 29, 2016, Fluellen visited Frontline Services in Cleveland, Ohio, for an initial
assessment, explaining that he had just arrived from Atlanta, Georgia, where he had been living.
Tr. 1145.  He had taken a bus from Atlanta to Cleveland because he had been told the mental
health services were better.  Tr. 1145, 1212.  He stated that he ran out of his Zoloft two days
prior, he needed to get his medication for his anxiety and anger and history of violence, and he
felt unstable and agitated and wanted to feel stable.  Tr. 1145.  The treatment provider noted,
"[Fluellen] seems to be verbalizing more symptoms and describing his violence in detail for
secondary gain."  Tr. 1146.  He was talkative and anxious.  Tr. 1146.  He reported that he had a
strange effect from his lithium.  Tr. 1146.  He was instructed to go to the emergency room at the
hospital to get his medications and was given a bus ticket.  Tr. 1146.  He went to the emergency
room and narrated his history, which included that he had, in the past, stabbed someone in the
neck.  Tr. 1212.  He denied suicidal or homicidal ideation.  Tr. 1212.  He was discharged and it
was noted that he had an appointment with Frontline on August 3.  Tr. 1212, 1214.

On August 3, 2016, Fluellen had a diagnostic assessment at Frontline.  Tr. 1149.  He
reported that, since being on lithium, his memory was "no good."  Tr. 1149.  He reported the
following symptoms: anxiety, fatigue, panic attacks, dysphoria, irritability, suicidal ideation, and
difficulty sleeping and concentrating.  Tr. 1152, 1153.  He was diagnosed with PTSD, bipolar,
and substance/alcohol use disorders in remission and continued on his medications.  Tr. 1146,
1147, 1156.

In September 2016, Fluellen went to Frontline explaining that his medication would be delivered soon and requesting three days worth of his medication until then.  Tr. 1183.  He denied medication side effects and stated that they helped his anxiety and anger.  Tr. 1183.

On October 5, 2016, Fluellen went to the emergency room complaining of atypical chest pain, anxiety, and numbness and tingling in his hands.  Tr. 1449.  Laboratory testing and an EKG came back negative and he was discharged.  Tr. 1454.

On October 23, 2016, Fluellen went to the emergency room complaining of anger issues and anxiety.  Tr. 1208.  He was out of his medication and would be getting them on "Monday." Tr. 1209.  The severity level was listed as" mild."  Tr. 1209.  Upon exam, he was cooperative and had an appropriate mood and affect and normal speech.  Tr. 1209.  He was given his usual dose of doxepin and discharged.  Tr. 1209-1210.

In December 2016, Fluellen went to Frontline for a follow-up appointment and reported doing well.  Tr. 1248.  He had no medication side effects.  Tr. 1248.  He was noted to have had some mild anxiety symptoms but discussed non-pharmacological interventions to help.  Tr. 1248.  He was "working out more" and stated that he was doing much better.  Tr. 1248.

In March 2017, Fluellen went to the Center for Families and Children ("Center"), explaining that he had left Frontline because he needed help with a therapist and with housing. Tr. 1346.  He stated that when he first arrived from Atlanta six months ago he was "off and really violent" but that he "finally got the right medications that really help me."  Tr. 1346.  The next week he had a follow-up appointment and reported "all was well and he was stable."  Tr. 1353.

On April 7, 2017, Fluellen had an initial assessment at the Center and reported getting "really irritable and violent" when not taking prescribed psychotropic medications.  Tr. 1339.

6

He reported past intermittent homicidal ideation towards his roommates at the City Mission where he lived, but none currently: "Being on my Depakote and reading my bible has really helped me" and he was avoiding confrontation.  Tr. 1339.  He described his mood as happy but it fluctuates and he feels irritable most of the time.  Tr. 1339.  He was noted to demonstrate some insight about his mood and anger outbursts, he was goal-oriented and wanted to get treatment, he was not a risk to himself or others, and he coped by getting involved in the church community and reading the bible.  Tr. 1343.

On April 14, 2017, Fluellen visited the Center for a follow-up visit, reporting that things were good and bad.  Tr. 1561.  He stated that two days prior he had a plan to cut himself in the throat and passive homicidal ideation towards his roommate but no plan.  Tr. 1561.  He stated that he will not act on it because of his religion and reading the bible also helped him not act out.  Tr. 1561.  He stated that he would like to get restarted on the medication Navane, which was effective in the past, although it made his tongue "roll[]."  Tr. 1561.  His sleep and appetite were good, he denied nightmares and paranoia, and the staff member noted that he was calm and cooperative during the interview and did not appear anxious or internally stimulated.  Tr. 1561.  Abilify was added to his medications due to the reported side effect of Navane.  Tr. 1562.

On April 23, 2017, Fluellen went to the emergency room due to heart palpitations for the last three months, that became more frequent over the last two weeks.  Tr. 1890.  Upon exam, he was pleasant, alert and cooperative with appropriate mood and behavior.  Tr. 1894.  The attending physician noted that palpitations can be caused by anxiety.  Tr. 1894.

On May 1, 2017, Fluellen had a follow-up at the Center and denied suicidal and homicidal ideation, and, despite feeling angry towards his bunkmate at the shelter, he felt his medication helped to control his anger impulses.  Tr. 1566.  He expected to move into

independent housing the next week.  Tr. 1566.  He was very engaged at his church, which helped him refrain from violence, self-harm and substance use.  Tr. 1566.  The staff member observed that Fluellen had low frustration tolerance at baseline but his insight, spirituality and medication management mitigated this symptom.  Tr. 1567.  He reported being addicted to games on his phone and compulsive behavior and he was observed to be playing games on his phone "feverishly" during the appointment and was difficult to redirect.  Tr. 1566-1567.  He was observed to be anxious.  Tr. 1567.  His medications were adjusted, including discontinuing his doxepin due to EKG changes.  Tr. 1567.

At a follow-up on May 5, 2017, Fluellen was observed to show signs of anxiety upon arrival at the Center and he was encouraged to do breathing exercises.  Tr. 1571.  It was noted that, as new anxiety coping skills were implemented, Fluellen's level of tension had decreased and his irritability diminished.  Tr. 1571.

On May 30, 2017, Fluellen visited the Center and stated that the Abilify made him feel spooky, timid, and hypervigilant.  Tr. 1578.  He denied suicidal ideation and reported that his relationships with others were much better and that he had been learning coping skills that were helping.  Tr. 1578.  He admitted he continued to take doxepin although it had been discontinued and that he had not taken the Zoloft, stating, "I'm so confused."  Tr. 1578.  He was still very engaged in his church.  Tr. 1578.  His medications were adjusted.  Tr. 1579.

On June 6, 2017, Fluellen displayed signs of anxiety while waiting for his appointment at the Center.  Tr. 1580.  His anxiety level decreased as he used his coping skills.  Tr. 1580.

On June 10, 2017, Fluellen went to the emergency room after reporting worsening suicidal ideation and new onset homicidal thoughts with no plan.  Tr. 1500.  He had thoughts of hurting his roommate at the City Mission, whom he stated has been disrespectful and

intentionally doing things to push him over the edge.  Tr. 1509.  He also reported being depressed for the last few days.  Tr. 1501.  Upon exam, he was appropriate and coherent, with good insight and judgment, a normal thought process with no evidence of psychosis, and he understood his illness.  Tr. 1507.  He was alert, cooperative, had good eye contact, and was in no distress.  Tr. 1512.  He had an anxious mood and a restricted and blunted affect.  Tr. 1512.  He was transferred to an acute care unit where he remained for three days.  Tr. 2137.

At a follow-up visit at the Center on June 26, 2017, Fluellen stated that his mood was good and reported uncontrolled anger at times and anxiety about 3-4 times a week.  Tr. 1583.  He reported that his Depakote was increased while in the hospital but that he had decreased it back to the prior level.  Tr. 1583.  His Depakote was increased to the level it was at the hospital.  Tr. 1584.  He reported that his suicidal urges had diminished and his depression had lifted.  Tr. 1587.

On July 25, 2017, Fluellen visited the Center and reported that his mood was much more manageable on the increased Depakote.  Tr. 1591.  He denied suicidal and homicidal ideation and felt much more in control of his thoughts.  Tr. 1591.  He had obtained housing and the transition made him anxious, but he was sleeping well, lived within walking distance of his church, and he enjoyed being active and cooking.  Tr. 1591.  He was observed to present with significant improvement in his mood stability, anxiety, insomnia, and impulse control after his medication adjustment.  Tr. 1592.  In August 2017 he was actively engaged in his visits and he transferred his care to Recovery Resources.  Tr. 1594, 1596.

On August 15, 2017, Fluellen had an intake assessment at Recovery Resources.  Tr. 1906.  Fluellen endorsed depressed mood, insomnia, fatigue, difficulty concentrating, irritability, racing thoughts, recurrent and intrusive memories and dreams, excessive vigilance, anxiety, restlessness, and suicidal ideation.  Tr. 1907-1909.  His substance and alcohol use disorders

9

remained in remission.  Tr. 1910, 1911.

On October 23, 2017, Fluellen was psychiatrically hospitalized for four days due to homicidal and suicidal ideation.  Tr. 2048-49, 2099, 2115.  He reported that his job at a deli, which he had started three weeks prior, involved working with young men who had been very disrespectful to him and he had thoughts of hurting them.  Tr. 2048.  He had also argued with some of the customers.  Tr. 2098.  Upon exam, he was calm and cooperative.  Tr. 2049.  He was diagnosed with depression with suicidal ideation and admitted as an inpatient in the psychiatric unit.  Tr. 2058, 2069.  Once there, he described his homicidal ideation in more detail, stating that he had gone as far as impulsively grabbing butcher's knives with thoughts of hurting the young men at work, rehearsing suicidal behaviors such as holding a knife against his neck, and stated that he felt threatened on the bus ride home.  Tr. 2100.  During the interview he was polite and pleasant.  Tr. 2100.  He had not been violent for two years.  Tr. 2105.  His medications were adjusted.  Tr. 2105-2106.

On May 3, 2018, Fluellen saw Aileen Hernandez, M.D., at Recovery Resources.  Tr. 2271.  He reported working as a baggage handler at the airport part time for two weeks.  Tr. 2268.  He did not like his two coworkers.  Tr. 2268.

From June 18-23, 2018, Fluellen was psychiatrically hospitalized after reporting suicidal ideation, although he was ambivalent about a plan.  Tr. 2345.  He reported increased anxiety resulting in sleep disturbances and waking up feeling scared.  Tr. 2348.  He had been feeling more emotional and had been crying.  Tr. 2348.  He had quit his airport job because he was too worried and anxious.  Tr. 2348.  The provider found it notable that Fluellen spoke calmly even when sharing his frustrations.  Tr. 2354.  Medication changes were recommended.  Tr. 2354.

In September 2018, Fluellen saw Dr. Hernandez.  Tr. 2456-2460.  His exam findings

were normal.  Tr. 2457-2458.

**C.  Medical Opinion Evidence**

On April 19, 2017, social worker Tiffany Lucas from the City Mission completed a Daily Activities Questionnaire on behalf of Fluellen.  Tr. 1357-1358.  Lucas stated that Fluellen was compliant with his medications and promptly attended his counseling sessions.  Tr. 1358.  She opined that he had poor stress tolerance and was unable to interact with others for extended periods of time.  Tr. 1357.

On September 15, 2017, Dr. Hernandez completed a medical source statement on behalf of Fluellen.  Tr. 1899-1900.  She stated that Fluellen had been under the care of her facility since August 15, 2017.  Tr. 1900.  She opined that Fluellen had a marked inability to: understand, learn, and carry out instructions and tasks; recognize a mistake and correct it; keep social interactions free of excessive irritability, sensitivity, and argumentativeness; adapt to change; work at an appropriate pace; change activities or work setting without being disruptive; and work a full day without needing extra breaks.  Tr. 1899, 1900.  He had an extreme inability to cooperate with others; respond to suggestions and criticism; use reason and judgement to make work related decisions; ignore or avoid distractions; complete tasks in a timely manner; set realistic goals; and to manage his psychological symptoms.  Tr. 1899-1900.  She attributed the causes of these limitations as Fluellen's diagnosed PTSD, bipolar, and generalized anxiety disorder.  Tr. 1900.  She explained that Fluellen "has manic depressive episodes, severe problems with anger, lost several jobs due to yelling or physical aggression[,]…. has a history of childhood abuse, feels very anxious/paranoid around others."  Tr. 1900.  He also thinks people at his church are against him.  Tr. 1900.

On July 30, 2018, Dr. Hernandez completed a second medical source statement on behalf

of Fluellen.  Tr. 2343-2344.  Dr. Hernandez found that all aspects of Fluellen's capacity for

interpersonal interactions (except his ability to understand and respond to social cues) were

extremely limited.  Tr. 2343.  She also found his ability to respond to demands and to be aware

of hazards and take appropriate precautions to be extremely limited.  Tr. 2344.  She noted that he

had been hospitalized at least 15 times for suicidality.  Tr. 2344.

### D.  Testimonial Evidence

#### 1.  Fluellen's Testimony

Fluellen was represented by counsel and testified at the administrative hearing.  Tr. 77.

He testified that he lives alone.  Tr. 94.

When asked why he felt that he was unable to work, Fluellen explained that he fought

people at his job.  Tr. 87.  He gets anxiety around people so bad that he shuts down and gets

"depression."  Tr. 87.  "Its been one thing after another.  Going home, having the suicidal

thoughts," and going to a crisis center in Atlanta and experiencing the same thing after coming to

Cleveland.  Tr. 87.  He tried working at Recovery Resources but was told it was not the right fit

for now; he had snapped at somebody because he thought they were talking about him.  Tr. 87.

He snapped at a customer and his anxiety got so bad that he ended up calling off work and then

he went to the hospital and was hospitalized for a week and was enrolled in a program.  Tr. 87-

88.

Fluellen has seen his therapist every week for about the past year, he sees Dr. Hernandez

once a month, and he has recently been going to a class about mindfulness.  Tr. 88.  He takes

medication and he has had no instances of extended periods of time without them.  Tr. 88-89.

His medications help his symptoms to a degree.  Tr. 89.  However, he does not believe that there

is "going to ever be a medium to where I'm just happy and joyful all the time because I take my

medications." Tr. 89.  There are many times when he is extremely down, has extreme anxiety, and has a period of happiness, but it's always the medications he takes.  Tr. 89.  It is like a sedation.  Tr. 89.  Other medication side effects include not sleeping well, "the rolled tongue," and he grits his teeth.  Tr. 90.  He finds himself sleeping during the day.  Tr. 90.  Sometimes he will go to bed at 9:00 p.m. and doesn't wake up until 10:00 a.m.  Tr. 90.  Once, he slept for 17 hours straight.  Tr. 90.

When asked to describe his difficulties with people, Fluellen stated that he doesn't know the people in his area.  Tr. 90.  He goes to the Kingdom Hall of Jehovah's Witnesses and has been studying with them.  Tr. 90-91.  However, he was sitting with a person and almost beat him up twice; the last argument they had, "it really came to blows with me putting my hands on him." Tr. 91.  Now, he is studying with another individual.  Tr. 91.  But there are times when he wants to put his hands on one of the members and he will "check" them.  Tr. 91.  He described a time when he was working construction in Atlanta and got into a fight with another worker and was asked to leave.  Tr. 92.  His therapist has told him to practice mindfulness twice a day and to implement STOP: stop, think, observe, and proceed with caution.  Tr. 92-93.  He still has these issues when out in public.  Tr. 93.  It happens in grocery stores or the library, dealing with people when they are getting "slick."  Tr. 93.  He feels that he has to handle issues that come up due to his time in prison and the streets, where if you let somebody push you it's a domino effect.  Tr. 93.

When asked if the police have ever had to get involved when things have gotten tense with others and, if so, when the most recent time was, Fluellen answered that police had gotten involved and the most recent time was three years ago, when he was living in Atlanta.  Tr. 94. There was a man sexually harassing his niece.  Tr. 94.  The man insulted Fluellen's niece and

Fluellen beat him and was sent to prison.  Tr. 95.

Fluellen recounted the medications he is taking for his mental health.  Tr. 95.  He takes Depakote and lamotrigine for bipolar, three times a day; clonazepam twice a day, and maybe one more medication.  Tr. 96.  He has been clean from drugs and alcohol for almost six years.  Tr. 96.  Studying with the Jehovah's Witnesses has helped him stay sober and he stays around positive people.  Tr. 96.

### 2. Medical Expert's Testimony

Dr. Neli Cohen, Psy.D., testified as a medical expert at the hearing.  Tr. 98-108.  After reviewing Fluellen's file and listening to his testimony, Dr. Cohen diagnosed him with polysubstance dependence, mood disorder, bipolar disorder, PTSD, and generalized anxiety disorder.  Tr. 98-99.  She opined that Fluellen was mildly limited in understanding, remembering, and applying information; mildly to moderately limited in concentrating, persisting, and maintaining pace; moderately limited in adapting and managing oneself; and markedly limited in interacting with others.  Tr. 105-108.  She concluded that Fluellen does not meet or medically equal a listed impairment.  Tr. 101.  She explained that his subjective complaints were not wholly consistent with his presentations during treatment; he complained of depression at his psychiatric admissions but his treating physicians routinely noted that he had an extremely vivid mood, interacted well with others, gave no indication that he had been depressive or extensively irritable, he participated in group therapy, and he was pleasant and cooperative.  Tr. 101.

### 3. Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing.  Tr. 110-114.  The ALJ asked the VE to determine whether a hypothetical individual with Fluellen's work experience could

perform work if that person had the limitations assessed in the ALJ's RFC determination, and the VE answered that such an individual could perform jobs that exist in significant numbers in the national economy, such as cleaner, night cleaner, and paperboard box maker.  Tr. 110-112.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant

work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if,
        based on his vocational factors and residual functional capacity, he is
        capable of performing other work that exists in significant numbers in the
        national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his November 8, 2018, decision, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security
        Act through September 30, 2018. Tr. 18.

2.      The claimant has not engaged in substantial gainful activity since
        September 26, 2013, the alleged onset date. Tr. 18.

3.      The claimant has the following severe impairments: major depressive
        disorder, personality disorder, bipolar disorder, anxiety disorder,
        posttraumatic stress disorder (PTSD) and history of polysubstance abuse.
        Tr. 18.

4.      The claimant does not have an impairment or combination of
        impairments that meets or medically equals the severity of one of the
        listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 20.

5.      The claimant has the residual functional capacity to perform a full range
        of work at all exertional levels but with the following nonexertional
        limitations: the claimant can understand, remember and carry out simple
        tasks; make simple work-related decisions; make simple plans; and

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

respond to minor changes in a routine work setting.  He should not work with the public or in close coordination with others.  Tr. 23.

6.   The claimant is unable to perform any past relevant work.  Tr. 30.

7.   The claimant was born in 1979 and was 34 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 31.

8.   The claimant has a limited education and is able to communicate in English.  Tr. 31.

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 31.

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 31.

11.  The claimant has not been under a disability, as defined in the Social Security Act, from September 26, 2013, through the date of this decision. Tr. 32.

## V. Plaintiff's Arguments

Fluellen argues that the ALJ violated the treating physician rule and erred when he found

that Fluellen did not meet a listing at step three.  Doc. 12, p. 1.

## VI. Law and Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681

(6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not violate the treating physician rule

Fluellen argues that the ALJ erred when he gave "little" weight to the opinion of his treating physician, Dr. Hernandez.  Doc. 12, p. 13.  Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole.  *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

After spending six pages discussing, in great detail, the evidence in the record and explaining why he found such evidence to support the RFC assessment, the ALJ considered the opinion evidence and wrote,

> …. Aileen Hernandez[,] M.D., a treating psychiatrist, completed checklist forms dated September 2017 and July 2018 (Exhibits B24F and B38F).  Dr. Hernandez checked off marked and extreme limitations in several areas of mental functioning (*Id.*).  For the same reasons discussed regarding the opinions of Drs. Souder, Tishler and Cohen, and Counselor Lucas, the undersigned gives little weight to the opinions of Counselor Zacharis and Dr. Hernandez.  Moreover, the undersigned further notes that Dr.

Hernandez's opinion is inconsistent with her own treatment records, which generally documented improved functioning and unremarkable mental status examinations (Exhibits B25F, B31F-B33F, B36F, B37F, B39F and B40F).

Tr. 30. Previously, with respect to the opinions of state agency reviewers Drs. Souder and

Tishler, the ALJ wrote,

> The opinions of Drs. Souder and Tishler [adopting the prior ALJ's RFC assessment] are consistent with evidence of record. As discussed, based on the claimant's positive response to treatment in conjunction with his mental status examinations generally documenting appropriate affect, intact memory, average intelligence, intact cognition, normal thought content, normal attention, normal concentration and logical thought process, the undersigned agrees that the claimant can understand, remember and carry out simple tasks. For these same reasons in conjunction with the claimant's generally good insight, intact judgment, intact impulse control, improved coping skills and independence with social skills, the undersigned agrees that the claimant can make simple work-related decisions and simple plans. Finally, based on the claimant's anxious mood, increased anger and anxiety in work settings involving public interaction and working in close coordination with coworkers, and generally cooperative behavior and calm demeanor, the undersigned agrees that the claimant can respond to minor changes in a routine work setting and interact appropriately so long as he does not work with the public or in close coordination with others.

Tr. 29 (citations to the record omitted). Regarding Counselor Lucas' opinion, the ALJ stated,

> Counselor Lucas opined the claimant's poor stress tolerance and inability to maintain in-person interaction with others for extended periods affected his ability to perform work activities on a regular and continuing basis. She also noted that the claimant has a lack of physical and emotional restraint in the work setting. For the same reasons discussed regarding the opinion of Drs. Souder and Tishler, the undersigned gives little weight to Counselor Lucas' opinion. As discussed in detail above, the claimant demonstrated significantly improved coping skills, was able to restrain himself from acting on homicidal or violent thoughts, and generally demonstrated appropriate affect, intact impulse control, good insight, average judgment, cooperative behavior, intact concentration, intact attention, average intelligence and intact memory. Accordingly, the undersigned finds Counselor Lucas' opinion to be overly restrictive and gives it little weight.

Tr. 29-30 (citations to the record omitted). And regarding Dr. Cohen's opinion, the ALJ

explained,

> Dr. Cohen diagnosed the claimant with polysubstance dependence, mood disorder, bipolar disorder, PTSD and generalized anxiety disorder. She noted that the claimant's subjective complaints were not wholly consistent with his presentations during treatment.

> Dr. Cohen opined the claimant is mildly limited understanding, remembering and applying information, markedly limited in interacting with others, mildly-to-moderately limited in concentrating, persisting and maintaining pace, and moderately limited in adapting and managing oneself.  She concluded the claimant does not meet or medically equal a listed impairment.  Dr. Cohen did not provide an opinion pertaining to the claimant's work-related mental limitations.  As discussed in detail above, the undersigned agrees with Dr. Cohen's opinion because it is consistent with the claimant's positive response to treatment, continued and/or worsening anxiety and anger outbursts in work setting[s] involving high-volume public interaction and coordinated work with others, and generally improved and/or unremarkable mental status examinations when compliant with treatment.  As such, the undersigned gives great weight to Dr. Cohen's opinion.

Tr. 22-23 (citations to the record omitted).

Fluellen argues that the ALJ erred because his rationale for discounting Dr. Hernandez's opinion was written in a "vague manner."  Doc. 12, p. 14.  He explains that the ALJ's discussion was "vague" because he cited to "almost 20 exhibits" in the record without referencing the exact pages he relied on.  Doc. 12, p. 14.  While true that the ALJ did not cite to page numbers, the ALJ, elsewhere in his decision, did cite to page numbers when recounting the evidence in the eight exhibits he cited in support of his finding with respect to Dr. Hernandez's opinion.  Tr. 28.  Moreover, even when the ALJ did not cite to page numbers earlier in his decision, the reviewer has no difficulty finding the information in the exhibits that the ALJ referenced.  For instance, the ALJ cited Exhibits B31F and B32F without referencing page numbers, but these exhibits pertain entirely to Fluellen's four-day hospital stay in October 2017, as the ALJ noted.  Tr. 28.  These hospital records are consistent with the ALJ's description of these (largely duplicative) records: the exacerbation of Fluellen's symptoms coincided with his recent job at a deli interacting with customers and coworkers he disliked, he was calm and cooperative when he presented to the hospital and his mental exam findings were mostly normal, his symptoms improved with medication, and he was stable at the time of discharge.  Tr. 28; Tr. 2048, 2049, 2052-2054, 2056-2057, 2061-2064, 2066-2067, 2100, 2102-2103, 2105-2106, 2111-2113.  The

ALJ explained that this evidence indicates that he should not work with the public or in close coordination with others and that his unremarkable presentation at the hospital and his response to treatment showed that he can interact appropriately otherwise.  Tr. 28.

The ALJ, elsewhere in his decision, also referenced and cited mental health treatment notes from August 2017 to June 2018 from Recovery Resources, where Fluellen saw Dr. Hernandez.  Tr. 28 (citing Exhibits B33F, B36F, B37F).  These treatment notes are as the ALJ described them: documenting a positive response to treatment and generally normal mental status exam findings, including a well-groomed appearance; full orientation; normal speech, attention, and concentration; appropriate fund of knowledge; cooperative behavior; intact memory; appropriate affect and thought content; fair insight and judgment; and spontaneous thought process.  Tr. 28; Tr. 2122-2123 (Dr. Hernandez), Tr. 2127-2128 (Dr. Hernandez), Tr. 2233-2234 (Dr. Hernandez), Tr. 2238-2239 (Dr. Hernandez), Tr. 2242-2244 (Dr. Hernandez), Tr. 2248-2249 (Dr. Hernandez), Tr. 2253-2254 (Dr. Hernandez), Tr. 2258-2259 (Dr. Hernandez), Tr. 2269-2270 (Dr. Hernandez), Tr. 2299-2300, Tr. 2302-2303, Tr. 2307-2308 (Dr. Hernandez).  The ALJ cited Exhibit 36F/10 (Tr. 2240, Dr. Hernandez) as an example of evidence that Fluellen tolerated his medications well.  Tr. 28.  The ALJ observed that Fluellen reported doing well, sleeping better, and maintaining his sobriety.  Tr. 28 (citing Exhibit B36F/12 (Tr. 2242) (Dr. Hernandez)).  He experienced some medication side effects that improved when his medications were adjusted.  Tr. 28 (citing Exhibits B36F/27, B37F/10, Tr. 2257, 2303).  The ALJ discussed how Fluellen's job at the airport in May 2018 was too much for him and exacerbated his anxiety, although he presented as well dressed and cooperative at his medication management appointment.  Tr. 28 (citing Exhibit 36F/38, Tr. 2268) (Dr. Hernandez)).  The ALJ explained that this evidence further supports a finding that Fluellen's reports of increased anger and anxiety in a work setting when

coordination with others is required meant that he should not work with the public or in close coordination with others.  Tr. 28.

The ALJ also discussed Fluellen's hospitalization for suicidal ideation in June 2018.  Tr. 28 (citing Exhibit B39F).  The ALJ observed that Fluellen later reported being ambivalent about a plan, which weakened his allegations of disabling suicidal ideation.  Tr. 28 (citing Exhibit B39F); see Tr. 2345 (hospital note observing that Fluellen endorsed a suicidal ideation upon admission but later discussed ambivalence about the plan).  The ALJ stated that, although Fluellen had reported depressive symptoms, he was observed as being euthymic and highly engaged with peers and group therapy, which weakened his allegations of disabling symptoms.  Tr. 28 (citing Exhibit B39F); see Tr. 2346 (hospital note observing that, despite Fluellen reporting depressive symptoms, he was highly engaged with his peers and actively participated in "groups").  The ALJ noted that his medications were adjusted due to his anxiety.  Tr. 28 (citing Exhibit B39F); see Tr. 2346 ("Given his endorsement of some anxiety, Buspar 5mg BID was added").  The ALJ commented that his follow up treatment notes at Recovery Resources showed a positive response to treatment, continued difficulty working with coworkers, a stable mood, good grooming, and independence with social skills.  Tr. 28 (citing Exhibit B40F); see, e.g., Tr. 2405 (independence with social skills), 2417, 2450 (Fluellen reporting problems working with other people), Tr. 2433 (treatment note listing his goals as "established," "continued with improvement" or "revised with improvement").  The ALJ also noted that his mental status exam findings during emergency room and routine office visits for physical symptoms were generally unremarkable.  Tr. 28-29.  The ALJ summed up the evidence described above as providing support for his finding that Fluellen can understand, remember and carry out simple tasks, make simple work-related decisions and make simple plans, and respond

to minor changes in a routine work setting and interact appropriately so long as he does not work with the public or in close coordination with others.  Tr. 29.  In short, the ALJ's reasoning for giving little weight to Dr. Hernandez's opinion was not "vague" because, elsewhere in his decision, he described in detail the evidence in the exhibits he cited when explaining that Dr. Hernandez's opinion was inconsistent with treatment records.

Fluellen contends that the ALJ ignored evidence and focused on the unremarkable mental status examinations over the course of six years of treatment.  Doc. 12, p. 15.  He asserts that he was seen at an emergency room for heightened anxiety or homicidal or suicidal ideation at least ten times from 2013 to 2018, and that at least six of these visits turned into inpatient stays at psychiatric wards.  Doc. 12, pp. 15-16 (citing Tr. 508, 602, 608, 549, 1200, 1208, 1501, 1890, 2045, 2048).  He asserts that this evidence shows that he did not have a successful response to therapy and medications.  Doc. 12, p. 16.  But the ALJ considered this evidence and found otherwise.  Considering Fluellen's cited evidence, the undersigned notes that, first, Tr. 508 is not a treatment note.  Tr. 602 is a discharge note from May 2014 with no apparent relevant information; the ALJ recognized that Fluellen was hospitalized on May 1, 2014, for suicidal ideation and intent and further explained that Fluellen was using alcohol, cocaine and marijuana at that time.  Tr. 25.  The ALJ noted that, despite this exacerbation, Fluellen still presented with largely normal mental exam findings, scored 30/30 (normal) on a Mini Mental Status Examination, and improved with treatment.  Tr. 25 (citing B2F/35, 43-46, 48).  Tr. 608 is a record that shows that Fluellen had a low to no suicide risk, no present intent or history of violence, no psychotic symptoms, no agitated behavior, but fear or anger and substance abuse, which supports the ALJ's findings relative to the May 2014 hospital stay.

Regarding further evidence cited by Fluellen, Tr. 549 is an assessment from July 2013

after Fluellen had been hospitalized for suicidal ideation. It explains that Fluellen recently relapsed into substance abuse and had stopped taking his medication. The ALJ considered Fluellen's July 2013 hospitalization and this exact treatment note (Exhibit B1F/13) and accurately explained that Fluellen's exacerbation was due to his having relapsed and being non-compliant with his prescribed psychotropic medications. Tr. 24. The ALJ also noted that the records from this visit show that, despite Fluellen feeling angry towards his brother, he was able to control his anger and he showed insight and impulse control. Tr. 24. Tr. 1200 is an October 5, 2016, record showing Fluellen went to the emergency room for atypical chest pain and the impression was anxiety disorder and atypical chest pain of unknown cause. Tr. 1208 is an October 23, 2016, emergency room visit for anger and anxiety. The ALJ acknowledged that Fluellen had anxiety and anger issues that worsened in October 2016 and further noted that at his October 23rd visit he had been out of his medications recently; even so, he was cooperative, had an appropriate mood and effect, his symptoms were described as "very mild," and he was prescribed his normal regimen of medications. Tr. 26; see also Tr. 1209-1210. Tr. 1501 is a record from Fluellen's emergency room visit and subsequent hospitalization in June 2017 for suicidal and homicidal ideation in which he expressed thoughts of hurting himself and others with a knife. The ALJ discussed this hospitalization, acknowledged that Fluellen had an anxious mood and constricted affect, but commented that his other exam findings were normal and he had good insight and appeared to understand his illness. Tr. 27 (citing B18F/53). The ALJ noted that follow-up care showed Fluellen to have a good mood, to be stable, and that his suicidal urges had lifted. Tr. 27 (citing B19F/27, 31). Tr. 1890 is another treatment note indicating Fluellen went to the emergency room for heart palpitations; testing was normal and he was described by the attending physician as "pleasant." Tr. 1890. Tr. 2045 shows no relevant

information.  And Tr. 2048 is an intake treatment note from Fluellen's emergency room visit and ultimate hospitalization in October 2017 while he had an exacerbation of symptoms while working at the deli, which the ALJ discussed.  Tr. 28.  Moreover, Fluellen was assessed as calm and cooperative at that time.  Tr. 2049.  None of the treatment notes cited by Fluellen were "ignore[d]" or "downplay[ed]" by the ALJ, as Fluellen asserts.  Rather, the cited evidence is in line with the ALJ's finding that Fluellen was generally found by treating providers to present well to them despite his reports of serious symptoms and that his relatively normal presentations undercut his allegations of disabling symptoms.

Moreover, the evidence supports the ALJ's finding that Fluellen had a successful response to therapy and medications, despite Fluellen's assertion to the contrary (Doc. 12, p. 16).  The ALJ stated that Fluellen himself had reported a positive response to his medications.  Tr. 26.  The ALJ commented that his symptoms worsened when he was not taking his medications.  Tr. 26.  He was effectively using coping mechanisms, such as avoiding confrontation and reading his bible.  Tr. 26.  His treatment notes routinely indicated that he was making progress, as the ALJ noted.  Tr. 27 (B19F/12-22).  Although he was hospitalized a number of times, some of these hospitalizations were due to medication non-compliance/relapsing into substance abuse or as a result of difficulties he had working with others.  And, as the ALJ observed, other hospitalizations not caused by the aforesaid showed that Fluellen presented in ways inconsistent with his allegations.  Tr. 27 (describing Fluellen's July 2017 hospitalization for worsening suicidal and homicidal ideation and mental exam findings showing a constricted affect and anxious mood, but also appropriate behavior, coherent thoughts, good insight and judgment, and he understood his illness); Tr. 28 (describing Fluellen's June 2018 hospitalization for suicidal ideation and treating sources observing him to be euthymic and highly engaged with peers and

group therapy).  Fluellen's assertion that he could not even work as a landscaper, "a profession that does not require a lot of public or interpersonal interaction," is not borne out by the record. Simply put, there is no testimony as to how Fluellen performed this job, although he reported that he left this job due to an argument with a peer.  Tr. 2450.

Fluellen submits that Dr. Hernandez's opinion is consistent with Counselor Lucas's opinion, who opined that Fluellen could not interact with others for extended periods of time due to poor stress tolerance and an inability to physically and emotionally restrain himself.  Doc. 12, p. 16.  But the ALJ discounted Lucas's opinion (a finding which Fluellen does not challenge) and explained that the record showed Fluellen had improved coping skills and was able to restrain himself from acting upon his homicidal or violent thoughts.  Tr. 30.

Finally, Fluellen argues that the ALJ erred because he gave more weight to the state agency reviewing physicians' opinions than to Dr. Hernandez's opinion.  Dc. 12, p. 17. However, this fact, alone, is not reversible error.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) ("Certainly, the ALJ's decision to accord greater weight to state agency physicians over Blakley's treating sources was not, by itself, reversible error.").  Fluellen submits that the factors in 20 C.F.R. § 404.1527(c) weigh in favor of crediting Dr. Hernandez's opinion over the state agency reviewers' opinions.  Doc. 12, p. 17-19.  But it is not the Court's job to reweigh the evidence, which is what Fluellen urges the Court to do.  *See Garner*, 745 F.2d at 387.

In sum, substantial evidence supports the ALJ's reasons for discounting Dr. Hernandez's opinion and his reasons are sufficiently clear to any subsequent reviewer.  *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007).

**B. The ALJ did not err at Step Three**

Fluellen argues that the ALJ erred when he concluded that he did not meet Listing 12.04, 12.06 or 12.15.  Doc. 12, p. 20.[3]  He challenges the ALJ's finding that he did not meet the paragraph B criteria, i.e., he did not have two "marked" or one "extreme" limitation in his ability to understand, remember, or apply information, to interact with others, to concentrate, persist, or maintain pace, or to adapt or manage oneself.  Doc. 12, p. 20.

Regarding the ability to understand, remember, or apply information, the ALJ found that Fluellen had a "mild" limitation.  Tr. 21.  Fluellen does not challenge this finding.  The ALJ found Fluellen had a "marked" limitation in interacting with others.  Tr. 21.  Fluellen argues that the ALJ should have found him to have an "extreme" limitation.  Doc. 12, p. 22.  But the ALJ explained that, although Fluellen at times presented as anxious and irritable and endorsed anger outbursts, homicidal ideation and violent thoughts towards others, he was generally appropriate, calm and cooperative upon exam and had good impulse control and improved coping skills, an observation also made by Dr. Cohen, as the ALJ noted.  Tr. 21, 22.  Fluellen simply disagrees with this determination, but evidence in the record supports the ALJ's finding.

The ALJ found that Fluellen has a "moderate" limitation in concentration, persistence and pace, explaining that Fluellen generally had full orientation, normal attention and concentration, logical and organized thought processes, above-average or average intelligence, and intact cognition, among other things.  Tr. 21.  The ALJ noted his daily activities included going to the gym, regularly reading his bible, cooking and regularly attending church.  Tr. 21-22.  Fluellen disagrees with the ALJ's findings and cites treatment notes purporting to support his assertion that his problems in this area were "severe."  Doc. 12, p. 22 (citing Tr. 1907-1909, Fluellen's reported history of symptoms during his initial intake assessment at Recovery

---

[3] At the hearing, Fluellen's attorney did not argue that Fluellen met a listed impairment, but that "a finding of disability can be made [at] Step Five."  Tr. 85.

Resources).  But the question is not whether there is substantial evidence to support Fluellen's arguments but whether substantial evidence supports the ALJ's decision.  *See Wright*, 321 F.3d at 614.  The ALJ repeatedly explained that Fluellen's presentation and objective exam findings were in contrast to the alleged severity of his symptoms.

Finally, Fluellen disagrees with the ALJ's finding that he has a "moderate" limitation adapting or managing himself, stating that his symptoms caused "countless emergency room visits and a host of inpatient hospitalizations" and that, therefore, he had a "marked" limitation in this area.  Doc. 12, p. 22.  But the ALJ disagreed, explaining that Fluellen was generally found upon exam to have a pleasant demeanor, improved coping skills, normal thought content, good insight, a clean and well-groomed appearance, average judgment and good impulse control.  Tr. 22.  He had low frustration tolerance but helped himself cope by being very engaged at his church and through his insight, spirituality, and medication management.  Tr. 22.  The evidence supports the ALJ's finding.  Moreover, the ALJ noted elsewhere in his decision that Fluellen routinely visited the emergency room for medication refills, not because he had an exacerbation of his symptoms.  Tr. 25, 26.

The ALJ did not err when he found that Fluellen did not meet a listing at step three.

## VIII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: December 31, 2019

*/s/ Kathleen B. Burke*

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).